No. 86-317

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

MICHAEL SANDAHL (Deceased),
STEPHANIE SANDAHL,

        Claimant and Appellant,

   -vs-

JAMES A. SLACK, INC., Employer,

    and

GLACIER GENERAL INSURANCE COMPANY,

        Defendant and Respondent.

APPEAL FROM: The Workers' Compensation Court, The Honorable
Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Michael C. Prezeau; Trieweiler Law Firm, Whitefish,
Montana

    For Respondent:

        P. Mars Scott; Mulroney, Delaney & Scott, Missoula,
Montana

Submitted on Briefs: Oct. 23, 1986

Decided: January 29, 1987

Filed: JAN 29 1987

*Ethel M. Harrison*
_____
Clerk

Mr. Justice William E. Hunt, Sr., delivered the Opinion of the Court.

This is an appeal from a judgment of the Workers' Compensation Court awarding Stephanie Sandahl survivorship benefits of $211.77 per week. We reverse and remand.

The only issue on appeal is whether periods of forced idleness should be excluded when calculating the compensation rate for beneficiaries of a deceased fulltime employee.

Michael Sandahl was killed on November 1, 1984 when his log truck overturned on an icy highway west of Kalispell. He was 33 years old at the time of his death and is survived by his wife Stephanie and two children.

Sandahl began his employment with James A. Slack, Inc. on January 2, 1984 as a driver of a log truck and like the other drivers employed by Slack, was paid a percentage of the amount he grossed with his truck. There was no salary or set hours of employment and no written contract existed between Slack and its employees. Drivers worked a five day work week but the average work day exceeded eight hours. However, there were times the drivers could not work due to equipment failures or spring break-up. The log truck drivers earned between $30-$70 per load, depending on the distance the logs were hauled.

The insurer accepted liability for Sandahl's death and began paying benefits to Stephanie at the rate of $200.36 per week. Stephanie filed a petition in the Workers' Compensation Court requesting that her benefit rate be raised to the maximum $286 per week. The Workers' Compensation Court held that her benefits should be increased but only by $11.41 per week to $211.77. She appeals.

Section 39-71-721, MCA, provides for the payment of death benefits to the beneficiaries of a worker killed in the course of his employment as follows:

> 39-71-721. Compensation for injury causing death. (1) If an injured employee dies and the injury was the proximate cause of such death, then the beneficiary of the deceased, as the case may be, is entitled to the same compensation as though the death occurred immediately following the injury, but the period during which the death benefit is paid shall be reduced by the period during or for which compensation was paid for the injury.
>
> (2) To beneficiaries as defined in subsections (2)(a) through (2)(b) of 39-71-116, weekly compensation benefits for injury causing death are computed at 66-2/3% of the decedent's wages. The maximum weekly compensation benefits may not exceed the state's average weekly wage. The minimum weekly compensation for death is 50% of the state's average weekly wage, but in no event may it exceed the decedent's actual wages at the time of his death . . .

Wages is defined in § 39-71-116(20), MCA, as:

> . . . the average gross earnings received by the employee at the time of the injury for the usual hours of employment in a week, and overtime is not to be considered. Sick leave benefits accrued by employees of public corporations, as defined by subsection (16) of this section, are considered wages.

In this case, the difficulty stems from determining what the "usual hours of employment in a week" would be. The insurer averaged the deceased's salary from the time he started working for Slack ($12,743.48) over the entire time of his employment (42.4 weeks). The insurer included in that time those weeks when the deceased did not work because of equipment failure and spring break-up, but did not include the week James A. Slack, Inc. closed down for hunting season. The insurer calculated the decedent's benefits as follows:

$12,743.48 ÷ 42.4 = 300.55
300.55 x 2 = 601.11
601.11 ÷ 3 = 200.36

It paid Stephanie $200.36 per week in benefits.

The Workers' Compensation Court concluded that the decedent's benefit rate should be based on the preceding four pay periods or 8 weeks. The Workers' Compensation Court also discounted the week for hunting season. The decedent's earnings were:

| | | | | |
|---|---|---|---|---|
| 1/01/84 | – | 1/15/84 | $ 845.14 | |
| 1/16/84 | – | 1/31/84 | 789.23 | |
| 2/01/84 | – | 2/15/84 | 852.42 | |
| 2/16/84 | – | 2/29/84 | 437.74 | Part-time--Beginning |
| 3/01/84 | – | 3/15/84 | 472.50 | of spring break-up |
| 3/16/84 | – | 3/31/84 | -0- | Spring break-up |
| 4/01/84 | – | 4/15/84 | -0- | " |
| 4/16/84 | – | 4/30/84 | -0- | " |
| 5/01/84 | – | 5/15/84 | -0- | " |
| 5/16/84 | – | 5/31/84 | 158.30 | 1 day-work began May 31 |
| 6/01/84 | – | 6/15/84 | 1,465.83 | |
| 6/16/84 | – | 6/30/84 | 912.78 | |
| 7/01/84 | – | 7/15/84 | 1,043.37 | |
| 7/16/84 | – | 7/31/84 | 1,258.06 | |
| 8/01/84 | – | 8/15/84 | 1,112.04 | |
| 8/16/84 | – | 8/31/84 | 994.45 | |
| 9/01/84 | – | 9/15/84 | 496.16 | Truck broke down 1 week |
| 9/16/84 | – | 9/30/84 | 416.24 | Loader broke down 1 week |
| 10/01/84 | – | 10/15/84 | 1,114.33 | |
| 10/16/84 | – | 10/31/84 | 377.89 | 1 week off for hunting season-loader broke down |

Thus the preceding 4 pay periods included three weeks during which the decedent did not work. Two of those weeks of unemployment were due to equipment failures, one week was hunting season. The Workers' Compensation Court included the weeks during which decedent did not work because of equipment failures, but excluded the week of hunting season. Thus the Workers' Compensation Court figured the benefit rate as follows:

| | | | |
|---|---|---|---|
| 9/01/84 | – | 9/15/84 | $ 496.16 |
| 9/16/84 | – | 9/30/84 | 416.24 |
| 10/01/84 | – | 10/15/84 | 1,114.33 |
| 10/16/84 | – | 10/31/84 | 377.89 |
| | | | $2,404.62 |

$$\$2,404.62 \div 7 \ 4/7 \text{ or } 7.57 = 317.65$$
$$317.65 \times 2 = 635.31$$
$$635.31 \div 3 = 211.77$$

On appeal, Stephanie contends that the periods of forced idleness should not be included in the calculation. She contends it is unfair to penalize her husband for the time he could not work due to equipment failures, especially when he was not penalized for the week off due to hunting season.

We have addressed the issue of how to calculate wages on several prior occasions, however, one case in particular is applicable to the situation at hand. In Infelt v. Horen (1959), 136 Mont. 217, 346 P.2d 556, we dealt with a logger who was injured when a log rolled over him. The employer claimed that at the time of the injury the claimant was making $41.17 per week. The claimant testified that he was not making much money when the injury occurred because the snow was too deep to work. He testified that he normally made $100 per week. We held that, ". . . enforced idleness because of weather conditions should not be considered in computing the average weekly wage." 136 Mont. at 222, 346 P.2d at 558. We also stated that is was unfair to measure claimant's wages at the time he was injured by the amount he received when the snow was so deep he could not work. Id. Likewise, in this case, the prior four pay periods happen to include two weeks during which the decedent could not work due to equipment failures. To include the periods of forced idleness in the calculations unfairly penalizes the decedent. When the enforced idleness is properly excluded, the correct calculations are as follows:

| | | | |
|---|---|---|---|
| 9/01/84 | – | 9/15/84 | $ 496.16 |
| 9/16/84 | – | 9/30/84 | 416.24 |
| 10/01/84 | – | 10/15/84 | 1,114.33 |
| 10/16/84 | – | 10/31/84 | 377.89 |
| | | | $2,404.62 |

- 5 -

```
$2,404.62 ÷ 5.57    =        431.70
   431.70 x 2       =        863.40
   863.40 ÷ 3       =        287.80
```

Because the maximum statutory rate in effect at the time of decedent's death was $286 per week pursuant to § 39-71-721, MCA, Stephanie is limited to that amount.

Reversed and remanded for findings consistent with this Opinion.

_____
                        Justice

We Concur:

_____
        Chief Justice

_____

_____

_____
                Justices

Mr. Justice L. C. Gulbrandson dissents as follows.

In my view, the majority has ignored the statutory requirement of determining the average gross earnings, and, by reversing the Workers' Compensation Court, seemingly has adopted an "earning capacity" test.

It is obvious that in the Montana logging industry, it is not unusual for a truck driver to be paid a percentage of the gross income produced by the vehicle involved. Here, the employer operated a fleet of five trucks, with five drivers. Each driver operated the same truck when logs were available to be hauled to the various mills. Trucks were not rotated among the various drivers, and each driver was responsible for the general cleanliness of the truck assigned to him. Each driver knew that his income was dependant upon the number and length of the hauls delivered to the mill. During the "spring breakup," it is customary for the Montana Highway Department and the U.S. Forest Service to impose weight restrictions on the use of roads. The restrictions may be total for a period of months, or truck traffic may be allowed during the morning hours until the roads start to thaw out. In the latter event, a trucker may get in one haul, whereas he would ordinarily be able to complete two or possibly three hauls. Each driver knows that the road restrictions are imposed every year and the drivers for James A. Slack, Inc. knew that no work would be available for them during the restricted period. The drivers were allowed to seek employment elsewhere or to apply for unemployment compensation. In fact, the record discloses that the decedent Sandahl did drive truck for another employer, for wages, for a portion of the time used in the computations

7

here.  Here, each driver knew that he would have no income during a period of equipment shutdown.  In extremely cold weather, logging equipment and machinery (owned and operated by other than the employer here) may not be operable, in which event there would be no logs available for hauling.

Here the insurer originally used the entire work history of the decedent with the James A. Slack Company in computing benefits in the amount of $200.36 weekly.  The Workers' Compensation Judge determined the proper period, to account for seasonal fluctuations, was the preceding four pay periods totaling eight weeks and four days, with a deduction of one week for hunting season, resulting in a weekly benefit of $211.77.

In my opinion, the Workers' Compensation Judge correctly concluded as follows:

> In the vast majority of cases, this mathematical calculation is based on the four pay periods preceding the injury as reported in the Claim for Compensation and the Employers First Report and there is no dispute.
>
> In Mahlum v. Broeder, 147 Mont. 386, 412 P.2d 572 (1966), the Supreme Court set the standard for defining wages when it was stated:
>
> ". . . What is a reasonable period of time, of course, depends on the circumstances of each case. The period must be sufficiently long to take into account seasonal fluctuations for hours, wage rates, vacations, and any other factors which may materially affect the average daily wage."
>
> This was reaffirmed in Walter v. National Automobile and Casualty Co., ___ Mont. ___, 592 P.2d 497 (1979) which interpreted 93-423 R.C.M., 1947, the predecessor to § 39-71--116(20), MCA, supra.
>
> The Court attempted to balance the legislature's directive which states that

the Act must be liberally construed in favor of the claimant, § 39-71-104, MCA, and the directives which impose various limits on benefits, § 39-71-721, MCA, § 39-71-116(20), MCA. The Supreme Court set the standard requiring . . . a reasonable period of time, which must be sufficiently long, to take into account seasonal fluctuations and any other factors which may materially affect the average daily wage. It did not state that the time periods affected should be thrown out of the calculation altogether, but rather [that] an averaging of time was the appropriate method. Accordingly, disputes over rates will vary from case to case. This allows the needed flexibility to deal with different circumstances. (Emphasis in original.)

I would affirm the order of the Workers' Compensation Judge.

Justice

9

Mr. Chief Justice J. A. Turnage, concurs with the dissent of Mr. Justice L. C. Gulbrandson:

The Workers' Compensation Court is required to follow § 39-71-116(2), MCA, in determining the employee's applicable wages based on his average gross earnings. There is no basis in the statute for a determination of wages in this case based upon an "earning capacity" test. The practical result of the majority opinion clearly is based on "earning capacity," a test not authorized by statute.

On occasion criticism has been levelled at the court system for perceived excesses in workers' compensation matters.

Whatever problems may exist should be put in proper context. In 1915 the Workers' Compensation Act was enacted, and since that time, the legislature has amended it so many times the amendments are almost uncountable. A casual review of the present statutes presents a picture of little, if any, coordination and much by way of confusing and conflicting provisions. The court system can only interpret and apply the law as given it by the legislature. For the courts to assure justice in this background of statutory morass is nearly an insurmountable task.

Unless some major effort is made to provide a statutory scheme that will assure speedy and effective justice to the unfortunate injured workers, I fear that the competing interests of the employer, insurer and injured worker will sink only further into the low-lying boggy ground of our present statutory scheme, with the interest of the injured worker deserving just and fair compensation often overshadowed by litigation that will follow every claim as a shadow follows its substance.

*J. A. Turnage*
Chief Justice

10